# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LESTER DOBBEY (R-16237),  )
                    )
       Plaintiff,  )        Case No. 12-cv-9223
                    )
       v.  )
                    )        Judge Robert M. Dow, Jr.
IMHOTEP CARTER and  )
DELORES TREVINO,  )
                    )
       Defendants.  )

## MEMORANDUM OPINION AND ORDER

Plaintiff Lester Dobbey, an Illinois inmate at Stateville Correctional Center, filed this civil rights action pursuant to 42 U.S.C. § 1983 against Stateville Medical Director Imhotep Carter and Registered Nurse Delores Trevino (collectively "Defendants"). Plaintiff alleges that Defendants acted with deliberate indifference to his knee issues after he received a steroid injection to one of his knees. On September 28, 2015, the Court granted Defendant Carter's motion for summary judgment, denied Nurse Trevino's motion for summary judgment, and denied Plaintiff's motions for summary judgment.[1] [146.] Currently before the Court is Plaintiff's motion to alter or amend the Court's grant of Defendant Carter's motion for summary judgment [149].[2] For the reasons set forth below, the Court denies Plaintiff's motion [149]. The Court will enter a final judgment in favor of Defendant Carter and against Plaintiff and close the case.

---

[1] Defendant Trevino has since been dismissed from this suit pursuant to a settlement. The dismissal is without prejudice at this time, but will convert to a dismissal with prejudice upon payment by the State of Illinois of the full settlement amount [see 190].

[2] After Plaintiff filed the motion *pro se*, counsel appeared on his behalf in this and several other cases pending in this Court. Magistrate Judge Rowland then held a series of "global" settlement conferences, which resulted in many settlements. Once it became clear that the dispute between Plaintiff and Defendant Carter would not be settled as part of the global mediation, Plaintiff's motion to reconsider was reinstated and fully briefed.

## I.      Background

A detailed statement of the facts is set out in the Court's summary judgment opinion [146].  For purposes of ruling on Plaintiff's currently-pending motion [149], the Court will set forth the facts that are relevant to Plaintiff's motion for reconsideration.  The Court draws the facts from the parties' Local Rule ("L.R.") 56.1 Statements of Material Facts ("SOF").  As noted in the Court's summary judgment opinion, where a party failed to respond to a proposed statement of fact or responded with an unsupported denial, the Court will not consider that response, and the proposed statement of fact will be deemed admitted.  See L.R. 56.1(a), 56.1(b)(3)(B); *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006); see also Fed. R. Civ. P. 56(e).

Plaintiff Lester Dobbey is an inmate incarcerated at Stateville Correctional Center.  [113 (Carter SOF), at ¶ 3.]  Defendant Dr. Imhotep Carter was the medical director at Stateville from July 25, 2011 to May 10, 2012.  [*Id.*, at ¶ 5.]  On August 25, 2011, Plaintiff was scheduled to see Dr. Carter in Stateville's health care unit.  [*Id.*, at ¶ 5.]  The parties disagree about what occurred during Plaintiff's visit, but they agree that later that day, Plaintiff filed a grievance claiming that Dr. Carter stated to him, "I'm not going to see you.  I saw you a few weeks ago, and I hear and see your name to[o] much.  So you can go back."  [117 (Plaintiff's SOF). ¶ 5.]  The grievance further stated that Plaintiff reported stomach pain, back pain, and knee swelling to Dr. Carter.  According to Plaintiff's grievance, Dr. Carter responded to the complaints by telling Plaintiff, "Well, put in for a sick call!"  [*Id.*]  The next month, a physician's assistant and medical technician noted Plaintiff's complaints of chronic knee pain, ordered x-rays, referred Plaintiff to the medical director, and provided analgesic balm and Tylenol.  [*Id.* at ¶¶ 8–11.]

On October 7, 2011, Dr. Carter saw Plaintiff about his knee pain. [*Id.*, at ¶ 12.] Dr. Carter observed tendinitis but saw no evidence of joint disease. [*Id.*] Dr. Carter noted in Plaintiff's file, "schedule knee steroid injections (Thursday)," and prescribed Plaintiff a knee sleeve. [See *id.* at ¶¶ 13, 18.] On October 24, 2011, Dr. Carter noted in Plaintiff's file that collegial review had approved the knee sleeve. [*Id.*, at ¶ 21.] Three days later, on October 27, 2011, Plaintiff received the steroid injection in his left knee. [*Id.* at ¶ 24.] At this point, Dr. Carter believed that Plaintiff had a sports-related knee contusion. [*Id.*]

Dr. Carter planned to have a follow-up appointment with Plaintiff three weeks after the injection. [*Id.*, at ¶ 24.] According to Dr. Carter, his general practice was to follow up with patients to evaluate the effectiveness of injections and to check for complications. [See *id.*, at ¶ 27.] Dr. Carter also planned to evaluate at the follow-up visit whether Plaintiff should receive an injection in his right knee. [*Id.*, at ¶ 24.] Plaintiff did not have the planned follow-up exam three weeks later, however. Plaintiff contends that that the injection caused his left knee to hurt more than it had before, such that at times, it would "give out." [*Id.*, at ¶ 29.]

Between October 27, 2011 (the day of the injection) and January of 2012, Plaintiff alleges that he submitted approximately ten medical request slips (about one per week), in which he complained of the increased knee pain. [113, at ¶ 30.] However, Plaintiff submits no evidence suggesting that Dr. Carter received, or was aware of, any of these requests. [*Id.*, at ¶ 30; see also 113 Exhibit A (Plaintiff's Deposition), at 73:2–18 (Plaintiff admitting that he had "no idea" if Dr. Carter had ever received any of his medical request slips).] Moreover, at Stateville, inmates' medical or "sick call" request slips are reviewed and triaged by the nursing staff, who prioritize medical services based on medical need. [113, at ¶ 42.] Thus, Dr. Carter reviewed inmates' sick call requests only when asked to do so by a nurse. [*Id.* at ¶ 43.] Dr.

Carter's practice was to initial and place in an inmate's medical file any medical request slips he reviewed. [See *id.*] Plaintiff's medical file contains no medical request slips initialed by Dr. Carter. [See 113 Exhibit B, 5–13.] In addition to receiving and triaging medical request slips, the nursing staff was also responsible for scheduling appointments, as well as processing and following up with physician orders for medical equipment. [113, at ¶ 44; 117, at ¶ 49.]

Plaintiff also wrote a grievance on November 25, 2011, detailing, among other ailments, the history of his knee problems, including that he was supposed to have a follow-up appointment three weeks after the steroid injection, but that no appointment had occurred. He further specified that he had not received the knee brace that Dr. Carter had ordered, that he was experiencing pain in both knees, and that his knees "clicked" when he bent them. [126, at ¶ 31.] The parties dispute whether Dr. Carter reviewed the November 25, 2011 grievance. Dr. Carter states he was not consulted about the grievance and was unaware of the complaints therein. [113, at ¶¶ 17, 19.] Plaintiff objects to these statements by Dr. Carter and cites to the Health Care Unit Policy and Procedure Manual ("the Manual"), which states that "[a]ll offender complaints/grievances received in the Health Care Unit will be forwarded to the Health Care Unit Administrator's Office" and that "[t]he Administrator and Medical Director will review all offender complaints." [117, at ¶ 44.] Dr. Carter contends that the policy quoted by Plaintiff does not reflect the actual practice regarding the review of grievances at Stateville and points out that the Manual also states that "the Administrator / Medical Director will assign complaints that do not necessitate intervention at their level to the appropriate staff person for response and corrective action if warranted." [126, at ¶ 44.]

It is undisputed that the November 25, 2011 grievance was received by former Defendant Nurse Trevino and that on January 5, 2012, she wrote a memo to the Grievance Office, stating:

[M]edical file shows 10/15/11 inmate was seen by LPN in urgent care for multiple complaints of stomach pain, back pain, knee pain, he was referred to MDSC for further evaluation. Condition ongoing. On 10/24/11 collegial review approved for knee sleeve. On 10/27/11 inmate was seen by Dr. Carter and had a left knee steroid injection. MD visit within 3 weeks of that to consider right knee injection. Condition ongoing.

[113, at ¶ 18; see also 1 (Complaint), at Exhibit K.] The Grievance Office then responded to Plaintiff's November 25, 2011 grievance, relying on Nurse Trevino's memo. [113, at ¶ 18; 113, Exhibit D, at 8.] There is no mention of any consultation with Dr. Carter about Plaintiff's complaints in Nurse Trevino's memo to the Grievance Office or in the Grievance Office's response to Plaintiff. Further, it is undisputed that after reviewing the grievance, Nurse Trevino did not follow up with any medical personnel about Plaintiff's complaints of ongoing knee pain, not receiving the approved knee sleeve, and not having a follow-up appointment with Dr. Carter after the steroid injection. [104, at ¶ 18; 129, at ¶ 18.] Although there are no directives or policies that would have prevented her from doing so, Trevino did not examine Plaintiff, schedule an appointment for him, or attempt to otherwise treat him after reviewing his grievance.[3] [104, at ¶ 19–21; 129, at ¶ 19–21.]

On January 23, 2012, Plaintiff filed an emergency grievance stating, among other complaints, that he had "not received the knee brace Dr. Carter [ ] stated [he] would receive." [117, at ¶ 32.] Plaintiff subsequently was scheduled for an appointment the next day but it was canceled, due to a facility lockdown. [*Id.*, at ¶¶ 33–34.] Stateville was on lockdown from January 23, 2012 through January 30, 2012 and from February 7, 2012 through February 8, 2012. [113, at ¶ 32.]

On February 14, 2012, Dr. Carter completed a prescription order for a knee sleeve for Plaintiff. [113, at ¶ 33; 117, at ¶ 36.] Dr. Carter subsequently saw Plaintiff on March 20, 2012,

---

[3] Because these facts created triable issues as to Defendant Trevino, the Court denied her motion for summary judgment. [146.]

and assessed his complaints of left knee pain as mild degenerative joint disease with tendinitis, issued Plaintiff a low-bunk permit, and prescribed him Naprosyn (an anti-inflammatory drug). [117, at ¶¶ 37, 39, 40.] After the March 20, 2012 appointment, Dr. Carter did not treat Plaintiff for any further complaints of knee pain. [113, at ¶ 60.]

Plaintiff brought suit alleging deliberate indifference against Dr. Carter and Nurse Trevino based on their alleged failure to provide adequate medical care for him. On September 28, 2015, this Court granted summary judgment for Dr. Carter, denied summary judgment for Nurse Trevino, and denied summary judgment for Plaintiff. [146.] On November 12, 2015, Plaintiff moved for reconsideration of the Court's grant of summary judgment for Dr. Carter. [149.] On January 19, 2017, the Court dismissed Nurse Trevino from this lawsuit pursuant to the parties' joint stipulation of dismissal pursuant to settlement. [190.]

## II.    Legal Standard

Plaintiff brings his motion to alter or amend judgment [149] pursuant to Federal Rules of Civil Procedure 59 and 60. However, there has not yet been a final judgment in this case, since the case was still pending against former Defendant Nurse Trevino when the Court granted summary judgment for Dr. Carter.[4] [146.] Thus, Rule 54(b) governs Plaintiff's motion for reconsideration. Under Rule 54(b), when multiple defendants are involved in a case, an order dismissing one defendant "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."[5] Fed. R. Civ. P. 54(b); see

---

[4] Former Defendant Nurse Trevino was not dismissed from the case until after Plaintiff filed his motion for reconsideration. [See 149, 190.]

[5] Rule 54(b) states:

> When an action presents more than one claim for relief * * * or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer

also *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir.), opinion amended on denial of reh'g, 835 F.2d 710 (7th Cir. 1987) (affirming district court's denial of motion to reconsider under Rule 54(b)); *Sherman v. Pleasant View Nursing Home, Inc.*, 1994 WL 66080, at *1 (N.D. Ill. Mar. 3, 1994) (applying Rule 54(b) to a motion for reconsideration of the dismissal of one defendant).

Revisions under Rule 54(b) are discouraged and should be reserved for circumstances in which the initial decision was "clearly erroneous and would work a manifest injustice." See *Ghashiyah v. Frank*, 2008 WL 680203, at *3 (E.D. Wis. Mar. 10, 2008) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988)) (internal quotation marks omitted). In general, "litigants must fight an uphill battle in order to prevail on a motion for reconsideration." *Id.* (citation and internal quotation marks omitted).

Motions to reconsider under Rule 54(b) "are judged by largely the same standards as motions to alter or amend a judgment under Rule 59(e)." *Ghashiyah*, 2008 WL 680203, at *3. The Court may a grant Rule 59(e) motion to alter or amend the judgment if the movant presents newly discovered evidence that was not available at the time of trial, points to evidence in the record that clearly establishes a manifest error of law or fact, or if the Court previously misunderstood a party's arguments. *Miller v. Safeco Ins. Co. of Am.*, 683 F.3d 805, 813 (7th Cir. 2012); *United States v. Ligas*, 549 F.3d 497, 501 (7th Cir. 2008). Rule 59(e) "enables the court to correct its own errors and thus avoid unnecessary appellate procedures." *Miller*, 683 F.3d at 813 (citation and internal quotation marks omitted). Rule 59(e) motions are "not appropriately used to advance arguments or theories that could and should have been made before the district

---

than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b).

court rendered a judgment, or to present evidence that was available earlier." *Id.* (citation and internal quotation marks omitted). Additionally, "'manifest error' is not demonstrated by the disappointment of the losing party. It is the 'wholesale disregard, misapplication, or failure to recognize controlling precedent.'" *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (quoting *Sedrak v. Callahan*, 987 F.Supp. 1063, 1069 (N.D. Ill. 1997)).

## III. Analysis

Plaintiff makes three main arguments for reconsideration of the Court's grant of summary judgment for Dr. Carter. First, Plaintiff contends in his *pro se* opening brief that based on "evidence [discovered] after summary judgment," the Court had erred in concluding that Dr. Carter was not aware that Plaintiff had not received the knee sleeve for several months after his October 7, 2011 examination. [149, at ¶ 5.] Second, Plaintiff argues in his *pro se* opening brief that Dr. Carter had to review Plaintiff's medical file on February 14, 2012 when he wrote the prescription order for the knee sleeve, and thus Dr. Carter should have realized at this point that Plaintiff had not had the three week follow-up visit for his knee injections. [*Id.*, at ¶ 16.] Third, in his reply brief, Plaintiff—now represented by counsel—argues that even setting aside Plaintiff's newly discovered evidence, the Court should grant reconsideration because the Court erred in construing the facts in the record at summary judgment.[6] [185-1, at 2.] The Court will address each argument in turn.

First, Plaintiff argues that the Court should reconsider its ruling because it misapprehended facts concerning Dr. Carter's role in ordering medical equipment. Plaintiff presents with his motion for reconsideration his own affidavit detailing his discussion with an

---

[6] The Court notes that ordinarily, arguments raised for the first time in reply briefs are waived. *Hernandez v. Cook Cy. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011). However, courts construe *pro se* filings liberally, thus the Court will exercise leniency and consider Plaintiff's third argument. See *Coulter v. Gramley*, 93 F.3d 394, 397 (7th Cir. 1996).

unidentified Stateville nurse regarding the process for ordering medical equipment. In the affidavit, Plaintiff states that he spoke with a nurse on October 24, 2015 who explained the following process: "first, a doctor has to plan on giving the inmate the knee sleeve; then the doctor has to seek collegial review, and if approved, the doctor must write a prescription order, [and] a nurse will turn the order in to central supply." [149, at 17.] He further asserts that according to the nurse, "if no prescription order is written, then a nurse cannot turn in the order until the prescription order is written by the doctor." Plaintiff contends that the Health Care Unit Policy and Procedure Manual supports his account of his conversation with the nurse. [*Id.* at ¶ 6.]

Plaintiff argues that this newly discovered evidence indicates that the Court erred in concluding that it was undisputed that the nursing staff, and not Dr. Carter himself, was responsible for ordering medical equipment. [149, at ¶ 10.] Plaintiff contends that it was Dr. Carter's responsibility to write a prescription order for the knee sleeve on October 24, 2011 when the knee sleeve was approved by collegial review, [*id.*, at ¶ 17], and that the nursing stuff could not have processed the order until after Dr. Carter wrote the prescription order on February 14, 2012, [*id.*, at ¶ 13.] Thus, according to Plaintiff, Dr. Carter's "blatant disregard of his personal knowledge that Plaintiff needed the knee sleeve" until "he felt like dealing with writing the prescription order" on February 14, 2012 evidences deliberate indifference. [See *id.* at ¶¶ 15, 19.]

There are several problems with this argument. First of all, when ruling on a motion for reconsideration, courts may only consider newly discovered evidence if the evidence was not available at the time of trial. See *Miller*, 683 F.3d at 813. In other words, a party may not use a motion for reconsideration to introduce new evidence that could have been presented earlier.

*Caisse Nationale de Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996).

Here, Plaintiff's affidavit details a conversation that took place approximately one month after this Court ruled on Dr. Carter's motion for summary judgment on September 28, 2015, and fifteen months after discovery closed on July 30, 2014 [70]. Yet, Plaintiff has not even attempted to demonstrate why he could not have located this witness earlier or obtained this evidence through reasonable diligence. Thus, the Court will not consider Plaintiff's new evidence at this late stage. See *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (affirming district court's refusal to receive new evidence presented with a motion for reconsideration and explaining that "[g]iven the ease with which [the new evidence could have been discovered], it cannot be said that [the party] exercised due diligence" and that "[a]ll of the arguments and facts in this case were or should have been available to [the party] prior to the District Court's original ruling").[7]

The Court notes that the Health Care Unit Policy and Procedure Manual is not newly presented evidence, as it was cited in the parties' summary judgment briefing. [See 112, at 11; 113, at ¶ 44; 113 Exhibit E, at 111.] However, the Court rejects Plaintiff's argument that Manual supports his account of the process for ordering medical equipment. The Manual states that "nursing personnel [are] responsible for the processing and follow-up of physician orders for supplies and equipment." The Manual then explains that "[t]he physician will write an order for an offender to receive supplies or equipment related to a medical condition," "[f]or some items, a collegial review process maybe [sic] completed," and "[w]hen the supply comes in, it will be delivered to the nursing staff." [149, at 19.] The Manual does not indicate that after ordering the knee sleeve for Plaintiff at his October 7, 2011 visit, Dr. Carter was required to write a second

---

[7] Further, even if Plaintiff's affidavit had been presented in a timely manner, it likely would be inadmissible on hearsay grounds, as it presents the (unidentified) nurse's out of court statement offered for the truth of the matter.

prescription order for the knee sleeve after collegial review was completed. Thus, the Court declines to grant reconsideration based on Plaintiff's newly presented affidavit or on the Health Care Unit Policy and Procedure Manual. See *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D. Ill. 1988) (explaining the "limited appropriateness of motions for reconsideration" and noting that district court opinions "are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure").

Next, Plaintiff's second argument does not warrant a lengthy discussion. Plaintiff contends that the Court should have inferred that Dr. Carter must have reviewed Plaintiff's medical file on February 14, 2012 when he wrote the prescription order for the knee sleeve, and thus Dr. Carter must have known that Plaintiff had not been scheduled for his follow-up visit three weeks after his knee injection. However, Plaintiff did not raise this argument in his summary judgment briefing, and motions for reconsideration are "not appropriately used to advance arguments or theories that could and should have been made before the district court rendered a judgment." *Miller*, 683 F.3d at 813 (citation and internal quotation marks omitted).

Additionally, there is no evidence in the record that Dr. Carter was required to review Plaintiff's entire medical file on February 14, 2012 in order to write the prescription order for the knee sleeve, nor is there any evidence that Dr. Carter did review Plaintiff's medical file at that time. Plaintiff cites to a line in the Manual that states, "[a]n equipment slip will be completed in duplicate; one copy given to the offender and the other copy will be kept in the urgent care treatment book," [149, at ¶ 16], but this policy related to the ordering of medical equipment does not suggest that Dr. Carter was required to review Plaintiff's medical file and appointment history to order the knee sleeve. Further, it is undisputed that the nursing staff at Stateville was responsible for scheduling appointments. [117, at ¶ 49; 113, at ¶ 44.] There is no evidence

indicating that Dr. Carter should have checked Plaintiff's medical file on February 14, 2012 to ensure that the nursing staff had carried out their duties in scheduling a follow-up appointment for Plaintiff or that any failure to have done so would rise to the level of deliberate indifference. For these reasons, Plaintiff's second argument for reconsideration fails.

Turning to Plaintiff's third argument, Plaintiff argues that the Court misconstrued the factual record and focused on the incorrect period of time when the Court stated: "Plaintiff does not allege that he spoke to or otherwise communicated with Dr. Carter about Plaintiff's knees between October 27, 2011, and March 20, 2012." [146, at 11.] According to Plaintiff, the relevant period of time with respect to the knee sleeve does not start on October 27, 2011 (when Plaintiff received his steroid injection), but rather when Dr. Carter first treated Plaintiff on October 7, 2011. Plaintiff contends that after October 7, 2011, there were two dates on which Dr. Carter could have submitted the prescription for the knee sleeve: October 24, 2011 (when collegial review approved the knee sleeve), and October 27, 2011 (when Plaintiff received his steroid injection). Specifically, Plaintiff argues that when Dr. Carter saw Plaintiff on October 27, 2011 to administer the steroid injection, he knew that the knee sleeve had been approved by collegial review, and thus he should have "executed the prescription order." Plaintiff claims that this was "the necessary step required before the nursing staff can fill the prescription" for the knee sleeve, [185-1, at 3], and that the Court should infer that Dr. Carter knew the procedure required to obtain a medical device, given Dr. Carter's knowledge of Statesville's procedures.

Again, the Court finds multiple problems with Plaintiff's argument. First, and most importantly, Plaintiff contends that this argument does not rely on his newly presented evidence (which the Court rejected above). However, the record does not contain any evidence that Dr. Carter was required to "execute the prescription order" after collegial review approved the knee

sleeve. Rather, it is undisputed that Dr. Carter prescribed Plaintiff a knee sleeve on October 7, 2011. [See, *e.g.*, 113 at ¶¶ 15, 24, 53; 113 Exhibit A (Plaintiff's Deposition), at 56:17–19; 58:18–20; 59:5–13; 117, at ¶¶ 13, 18; 146, at 3; 185-1, at 3.] It is also undisputed that the nursing staff was "responsible for the processing and follow-up of physician orders for supplies and equipment," as stated in the Health Care Unit Policy and Procedure Manual. [113, at ¶ 44.] There is no evidence in the record supporting an inference that Dr. Carter was required to write a second prescription for the knee sleeve after the collegial review process, in addition to prescribing the knee sleeve when he treated Plaintiff on October 7, 2011.

Plaintiff argues in a footnote in his reply brief that "the timeline of Dr. Carter's treatment of Plaintiff is a sufficient basis to infer Dr. Carter's knowledge that he had to submit a prescription after [the knee sleeve was approved by collegial review], because he eventually took that precise course of action in February 2012." [185-1, at 2 n.1.] However, this argument has no support in the record. See *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1139 (7th Cir. 1997) (explaining that at the summary judgment stage, courts are not required "to draw every conceivable inference from the record," and rather that courts "need draw only reasonable ones"). It is unclear from the record what the exact impetus was for Dr. Carter's February 14, 2012 prescription, but there is no support for Plaintiff's argument that Dr. Carter knew all along that he was required to write a second prescription and simply delayed doing so until February 2012. A more natural inference from the timeline of events is that Dr. Carter wrote a second prescription for the knee sleeve on February 14, 2012 because Plaintiff's January 23, 2012 emergency grievance was received by the nursing staff and brought to his attention, thus alerting

him to the fact that the nursing staff had not processed the first prescription that Dr. Carter wrote on October 7, 2011.[8]

Thus, even if Dr. Carter knew on October 27, 2011, when he administered Plaintiff's steroid injection, that the knee sleeve had been approved by collegial review on October 24, 2011 and that Plaintiff did not yet have the knee sleeve, no reasonable jury could find that the fact that he did not write a second prescription on October 27, 2011 constitutes deliberate indifference. Since the nursing staff was responsible for processing orders for medical equipment, Dr. Carter reasonably could have expected that the nursing staff would soon process the order, or that they had already processed the order on or around October 24, 2011 and that the knee sleeve would soon be given to Plaintiff. See *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("[B]ureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks."). Therefore, Plaintiff still has not demonstrated that Dr. Carter actually knew of and disregarded a substantial risk of harm.[9] See *Petties v. Carter*, 836 F.3d

---

[8] Stateville was on lockdown from January 23, 2012 through January 30, 2012 and from February 7, 2012 through February 8, 2012. [113, at ¶ 32.]

[9] As the Court explained in its summary judgment opinion [see 146, at 12-13], the evidence in the record indicates that Dr. Carter did not review Plaintiff's November 25, 2011 grievance, which was received by former Defendant Nurse Trevino. [146, at 12–13]; see also *Jones v. Drew*, 221 F. App'x 450, 454 (7th Cir. 2007) (affirming summary judgment for defendant warden where there was no evidence that warden personally received plaintiff's grievance since he delegated the review of prisoner complaints to others within his office); *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006) overruled on other grounds by *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013) (affirming summary judgment for Director of Illinois Department of Corrections where affidavit of Manager of IDOC's Office of Inmate Issues stated that Defendant Director did not receive or review appeals of inmate grievances and that such tasks were delegated to others in the department and explaining that there was no evidence that Defendant Director actually read the grievances or had any subjective awareness of plaintiff's condition); *Manney v. Monroe*, 151 F. Supp. 2d 976, 987 (N.D. Ill. 2001) (dismissing defendant jail superintendent from deliberate indifference case where superintendent denied receiving Plaintiff's grievances and explained that he does not receive or review health care grievances and that they are received by another employee at the jail). Plaintiff does not challenge this conclusion in his motion for reconsideration.

722, 728 (7th Cir. 2016), as amended (Aug. 25, 2016) ("Even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it should be known—is insufficient to make out a claim [for deliberate indifference]. Instead, the Supreme Court has instructed us that a plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm. (citing *Farmer v. Brennan*, 511 U.S. 825, 836–38 (1994)). As the Court stated in its summary judgment opinion, "Dr. Carter's failure to * * * order the knee sleeve himself immediately after the October 2011, steroid injection at most may constitute negligence." [146, at 11.]

Finally, the Court rejects Plaintiff's argument that the Court focused on the incorrect period of time for purposes of its summary judgment analysis. To the extent that Plaintiff implies that the Court did not analyze the time period prior to October 27, 2011, this is incorrect. Plaintiff correctly quoted the Court's statement that "Plaintiff does not allege that he spoke to or otherwise communicated with Dr. Carter about Plaintiff's knees between October 27, 2011, and March 20, 2012," [185-1, at 3 (quoting 146, at 11)], but Plaintiff takes this sentence out of context. The Court also analyzed the time period before October 27, 2011 and concluded that "[t]he record contains no indication that Dr. Carter's actions up to October 27, 2011, constituted deliberate indifference." [146, at 10.]

---

Any inference that Dr. Carter received the grievance is thwarted by the following facts: (1) Dr. Carter denies reviewing the grievance; (2) Dr. Carter contends that the policy quoted by Plaintiff does not reflect the actual practice regarding the review of grievances at Stateville; (3) the Manual also states that "the Administrator / Medical Director will assign complaints that do not necessitate intervention at their level to the appropriate staff person for response and corrective action if warranted," [126, at ¶ 44]; (4) Dr. Carter states that grievances were routed to the Health Care Unit Administrative Office and that he reviewed only those grievances brought to his attention, and that if a grievance did not require his intervention, the administrator would assign it to the appropriate staff for investigation; (5) it is undisputed that former Defendant Nurse Trevino actually received the November 25, 2011 grievance and that on January 5, 2012, Trevino wrote a memo to the Grievance Office; (6) there is no mention of any consultation with Dr. Carter about Plaintiff's complaints in Trevino's memo or in the Grievance Office's response to Plaintiff; and (7) it is undisputed that after reviewing the grievance, Trevino did not follow up with any medical personnel about Plaintiff's complaints.

For all of these reasons, Plaintiff has not "present[ed] newly discovered evidence that was not available at the time of trial," or "point[ed] to evidence in the record that clearly establishes a manifest error of law or fact, " *Miller*, 683 F.3d at 813, and thus the Court denies Plaintiff's motion for reconsideration.

**IV.     Conclusion**

For the reasons stated above, the Court denies Plaintiff's motion for reconsideration [149].  The Court will enter final judgment in favor of Defendant Carter and against Plaintiff and close the case.

Dated: June 14, 2017

_____
Robert M. Dow, Jr.
United States District Judge